[No. C011045. Third Dist. June 12, 1992.]

DEPARTMENT OF TRANSPORTATION et al., Plaintiffs and
Respondents, v.
RICHARD CHAVEZ, as President, etc., Defendant and Appellant.

**COUNSEL**

Daniel E. Lungren, Attorney General, Henry Ullerich, Assistant Attorney General, Richard Thomson and Shelley Mydans, Deputy Attorneys General, for Defendant and Appellant.

Charles E. Spencer, William M. McMillian, Diepenbrock, Wulff, Plant & Hannegan and David Rosenberg for Plaintiffs and Respondents.

**OPINION**

NICHOLSON, J.—In this appeal, we construe subdivision (b)(2) of Government Code section 19130,[1] which specifies the conditions under which the State of California can contract with private firms for the performance of personal services. Subdivision (b)(2) permits personal service contracts where "[t]he contract is for a new state function and the Legislature has specifically mandated or authorized the performance of the work by independent contractors."

Plaintiff Department of Transportation (Caltrans) petitioned for a writ of mandate to set aside defendant State Personnel Board's (Board) order invalidating contracts with private firms for maintenance of roadside rest areas. The Board appeals from the judgment granting that petition.[2] We conclude the trial court erred in finding the maintenance of roadside rest areas constituted a "new state function" when the contracts were executed with the private firms. Accordingly, we reverse the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Caltrans and the California State Employees Association (CSEA) stipulated to the following facts at the administrative hearing ordered by the Board:

"In 1963, the Legislature entrusted to the Department of Transportation the responsibility for areas alongside public highways that were to be used

---

[1]All statutory references are to the Government Code unless otherwise indicated. Citations to "subdivision (b)(2)" refer to section 19130.

[2]Although Richard Chavez, president of the State Personnel Board, is named in the caption of Caltrans' petition for writ of mandate, the State Personnel Board was the respondent.

for roadside rest stops for motorists. Previous to 1963, some of the same areas had been under the jurisdiction of the Department of Parks and Recreation. Insofar as employees were needed to work in those areas, civil service employees from the Department of Parks and Recreation were assigned. At the same time, in 1963, the Legislature enacted Streets and Highway[s] Code 223 which now provides, 'The Department [of Transportation] may contract with other governmental agencies or private organizations or individuals for the construction and operation of traveler service information facilities and for the maintenance of all or any of such safety roadside rests where it deems it necessary or desirable.'

"The first roadside rest stops were constructed in 1965. By 1980, the present system of 90 rest stops was complete. Between 1965 and 1985, routine maintenance, landscaping and janitorial work on the rest stops were performed for the most part by civil service employees during their regular work hours. Most roadside rest stops were serviced by maintenance crews along with their normal maintenance and landscaping duties on adjoining highways. Where roadside rest areas were heavily utilized, some Caltrans employees worked there as a full time assignment.

"In 1973 the Department contracted out the work of maintaining a limited number of rest stops in areas that were remote from regular Caltrans operations. In Fiscal Year 1984-85, Caltrans contracted out the maintenance functions in a larger sample of rest stops statewide as an experiment. Caltrans was satisfied with the results and contracted out the maintenance of all roadside rest stops in Fiscal Year 1985-86.

"Caltrans currently hires employees in the civil service categories of Caltrans Highway Maintenance Worker, Caltrans Landscape Maintenance Worker, Groundskeeper and Janitor. The current job descriptions for these classifications include all of the tasks that employees of private contractors currently perform under the contracts between them and Caltrans that are at issue in this proceeding. However, since the employees of private contracts have taken over the maintenance of the roadside rest stops, some busy rest stops are staffed 12 hours a day, some 16 hours a day and others 24 hours a day. When the Caltrans employees worked in the roadside rest stops they did so as part of their regular eight-hour shifts. There is no reason in principle, however, why Caltrans could not initiate additional shifts, including staggered shifts, to have the roadside rest areas covered more than eight hours a day.

"When the private contracts at issue in this proceeding went into effect in 1985, Caltrans did not lay off any employees. Employees who previously

cleaned the [rest rooms] and worked on the landscaping, and so forth, were absorbed into the highway crews working in those areas. Since at the time, Caltrans had not hired new employees in proportion to new highways that had been constructed, there was plenty of work for the employees who previously worked at the rest stops. If Caltrans were now required to use civil service employees to work at the rest stops, new civil service employees would need to be hired.

"Caltrans is not taking the position that the contracts with the private contractors save costs."

In April 1987, the Board's executive officer tentatively approved the contracts for maintenance of all roadside rest stops. CSEA, which represented employees who had previously maintained the rest stops and who would have continued with this work had the contracts not been approved, objected to the tentative approval and asked the Board to review the contracts. The Board referred the matter to an administrative law judge.

On October 4, 1988, the Board adopted the administrative law judge's decision which declared the contracts void. Subsequently, the Board granted rehearing and referred the matter back to the administrative law judge.

The California Association of Rehabilitation Facilities (CALARF) intervened as a petitioner on behalf of organizations which provide services for the developmentally disabled individuals who contract with Caltrans to work at the roadside rest stops. The administrative law judge submitted a second decision which the Board rejected.

The Board then determined the contracts were "illegal and void." In reaching this decision, the Board reasoned: (1) Streets and Highways Code section 223 authorizes Caltrans to execute contracts for maintenance of roadside rest stops; (2) even assuming, without finding, rest stop maintenance was a new state function at the time the rest stops were first constructed, after 20 years the functions could not be considered new; and (3) the phrase "new state function" in subdivision (b)(2) necessarily means "new" at the time the contracts are implemented so no displacement of state civil service results.

Caltrans filed a petition for writ of administrative mandamus pursuant to Code of Civil Procedure section 1094.5 seeking to set aside the Board's decision. The court entered judgment on March 25, 1991, directing the Board to set aside and vacate its order invalidating the Caltrans contracts for maintenance of roadside rest areas.

In its oral statement of decision, the court expressed concern Caltrans lost the "discretion" granted by Streets and Highways Code section 223 to contract with "private organizations" once it opted to use state employees for maintenance of roadside rest stops. The court was also troubled by the Board having to draw a bright line between new and existing state functions. It offered a series of questions: "So, theoretically, the day after something goes into effect, it's no longer new. When does something cease becoming new? After a year? When is the program? When you completed the last rest stop? If we are continuing to complete rest stops, is it still a new program?"

## DISCUSSION

## I

### *The Court Erred in Construing Subdivision (b)(2)*

The central question in this appeal is whether the Caltrans contracts with private firms for the maintenance of roadside rest stops pursuant to Streets and Highways Code section 223 involve a "new state function" within the meaning of subdivision (b)(2). We are not bound by the trial court's application of subdivision (b)(2) and Streets and Highways Code section 223. (*Webb* v. *Miller* (1986) 187 Cal.App.3d 619, 625 [232 Cal.Rptr. 50].)

To resolve this question, we first consider Streets and Highways Code section 223 within the constitutional and statutory framework of civil service law, and conclude the statute is subject to constitutional restrictions on "contracting out." Next, we apply rules of statutory construction to subdivision (b)(2), and decide subdivision (b)(2) permits contracts with private firms only where there is legislative authorization *and* the work involves a *new* state function *at the time the contracts are executed.* Based on these conclusions, we hold the court erred in granting Caltrans' petition for writ of mandate.

### A. *Constitutional and Statutory Scheme*

■ The Board contends Streets and Highways Code section 223 must be narrowly construed to preserve its validity in the face of article VII of the California Constitution (article VII). Caltrans and CALARF ignore article VII and argue Streets and Highways Code section 223 provides specific legislative authority to contract out maintenance of roadside rest stops. They contend section 223 is "simply a special exception to Government Code Section 19130," and the statutes are not inconsistent.

Article VII provides for permanent appointment and promotion in the state civil service "based on merit ascertained by competitive examination."[3] (Art. VII, § 1, subd. (b).) Article VII establishes the State Personnel Board with authority to enforce the civil service law. (Art. VII, §§ 2, 3.) It also exempts certain positions from the civil service which otherwise "includes every officer and employee of the State." (Art. VII, §§ 1, 4.) Article VII is implemented by the state Civil Service Act. (§ 18500 et seq.; *California State Employees' Assn.* v. *Williams* (1970) 7 Cal.App.3d 390, 395 [86 Cal.Rptr. 305].)

Decisional law interprets article VII as a restriction on contracting out state work to the private sector. (*California State Employees' Assn.* v. *State of California* (1988) 199 Cal.App.3d 840, 844 [245 Cal.Rptr. 232].) As we stated in *Williams*, the restriction does not arise from the express language of the constitutional provision. "Rather, it emanates from an implicit necessity for protecting the policy of the organic civil service mandate against dissolution and destruction." (*California State Employees' Association* v. *Williams, supra*, 7 Cal.App.3d at p. 397.)

After the civil service system was instituted in California, the courts clarified specific exceptions to the constitutional restriction on contracting out. In *Burum* v. *State Compensation Ins. Fund* (1947) 30 Cal.2d 575 [184 P.2d 505], and *State Compensation Ins. Fund* v. *Riley* (1937) 9 Cal.2d 126 [69 P.2d 985, 111 A.L.R. 1503], the California Supreme Court held a state agency could contract with a private firm where the job task or skill could not be " 'adequately or competently or satisfactorily' " performed by civil service personnel. (*Burum* v. *State Compensation Ins. Fund, supra*, at p. 582.)

The Supreme Court interpreted a San Francisco charter provision similar to article VII in *San Francisco* v. *Boyd* (1941) 17 Cal.2d 606 [110 P.2d 1036], and *Kennedy* v. *Ross* (1946) 28 Cal.2d 569 [170 P.2d 904]. The court held contracts retaining expert engineering consultants did not violate the civil service employment system. Citing *Boyd*, the *Kennedy* court concluded a city agency "is empowered in proper cases to engage the services of an expert in a field covered by an existing department without a resulting illegal duplication of the functions and duties of existing officers and departments." (*Kennedy* v. *Ross, supra*, at p. 573.)

In *Williams*, we held the statute and contracts which set up administration of the Medi-Cal program through private insurance carriers did not violate

---

[3]When originally enacted in 1934, the civil service provisions of the state Constitution were set forth in article XXIV. (See prior law annot., Deering's Annot. Const. (1981 ed.) art. VII, § 1, p. 271.)

civil service law. (*California State Employees' Assn.* v. *Williams, supra,* 7 Cal.App.3d at p. 400.) We noted the expansion of state government structure since the civil service system was implemented in 1934, and stated:

"Viewed within the conceptual framework of these evolutionary developments, the constitutional policy of a merit employment system within the system of state agencies engenders no demand for achieving expansions of state function exclusively through the traditional modes of direct administration. It does not prohibit legislative experimentation in new forms to fit new functions. It compels expansion of civil service with expansions of state agency structure but does not force expansions of state agency structure to match extensions of state function. *To the contrary, the state civil service suffers no displacement and the underlying constitutional policy is not offended when a new state activity is conducted by contract with a separate public or private entity.*" (7 Cal.App.3d at p. 399, italics added.)

The Legislature enacted section 19130 in 1982. Subdivision (a) codifies Board standards concerning the award of contracts to private firms to achieve cost savings. Subdivision (b) codifies the judicially imposed conditions on the award of personal service contracts outside the civil service system. (*California State Employees' Assn.* v. *State of California, supra,* 199 Cal.App.3d at pp. 844-845.)

Streets and Highways Code section 223, enacted in 1963, is subject to the constitutional restriction on contracting out found in article VII, the judicial decisions which followed establishment of the civil service system, and the statutes which codified those decisions. The Constitution must be given effect as the paramount law of the state. (*Playboy Enterprises, Inc.* v. *Superior Court* (1984) 154 Cal.App.3d 14, 28 [201 Cal.Rptr. 207], citing *Ex Parte Braun* (1903) 141 Cal. 204, 211 [74 P. 780].) Thus, section 223 authorizes Caltrans to contract with private organizations for maintenance of the roadside rest stops, but only if the contracts fall within recognized exceptions to the constitutional restriction on contracting out.

B. *"New State Function"*

Here the relevant limitations are set forth in *Williams* and codified in subdivision (b)(2). Private contracts are permissible where "[t]he contract is for a new state function and the Legislature has specifically mandated or authorized the performance of the work by independent contractors." The parties do not question the Legislature authorized private contracts in Streets and Highways Code section 223. Their disagreement focuses on the meaning of "new state function" and when the "newness" of the state function must be measured.

After reviewing the contracts, the Board determined the phrase "new state function" necessarily meant "new" at the time the contracts were *implemented* so state civil service employees would not be displaced. Caltrans and CALARF maintain the Board's interpretation creates an unworkable situation which requires governmental entities to guess what constitutes a new or existing state function before deciding to contract out. Thus, CALARF argues, "[b]ecause all services were once new and all services eventually become old, Government Code Section 19130(b)(2) can only make sense if the newness of the service is evaluated as of the date the [L]egislature *authorizes* contracting out. Accordingly, if the service is new at that time of authorization, then that service can be contracted out until the authorizing legislation is amended or repealed by the Legislature." (Italics added.)

As we stated earlier, the trial court was concerned Caltrans lost its discretion to contract with private firms once it elected to use state civil service employees for maintenance of the roadside rest stops. It also worried there was no clear line to differentiate between new and existing state functions. Neither of these concerns is relevant to the court's role in construing subdivision (b)(2).

In *California State Employees' Assn.* v. *State Personnel Bd.* (1986) 178 Cal.App.3d 372 [223 Cal.Rptr. 826], we applied accepted principles of statutory construction to interpret section 19130, subdivision (a)(2), which permits private contracts as a cost-saving measure "if the contractor's wages are at the industry's level *and* do not significantly undercut state pay rates." (Italics added.) The appellant argued the contractor did not "undercut" state pay rates as long as the contractor paid the prevailing wage in the industry. (At p. 378.)

In that opinion, we stated courts are bound to give effect to statutes according to the usual, ordinary import of their language. (178 Cal.App.3d at p. 378.) Absent an absurd result, we are not free to disregard ordinary rules of grammar and syntax in the interpretation of a statute. (*Ibid.*) Furthermore, an interpretation which renders terms of a statute surplusage should be avoided, and every word should be given some significance, leaving no part useless or devoid of meaning. (*Ibid.*) Applying these principles, we concluded the "and" meant the agency was required to satisfy both stated requirements. We rejected the interpretation which made the second condition surplusage. (*Id.* at pp. 378-379.)

We reach a similar result when applying these rules of statutory construction to subdivision (b)(2). The presence of "and" means both requirements must be satisfied: (1) the contract must be for a new state

function, *and* (2) the Legislature must specifically authorize the use of independent contractors. There is nothing in the wording of the second prong of subdivision (b)(2) to suggest legislative authorization to contract for some particular governmental activity, in and of itself, establishes that activity as a "new state function." Moreover, even a "new state function" is not preserved as such merely because it becomes subject to a personal services contract during the life of an authorizing statute. The ordinary import of the first prong of subdivision (b)(2) is the contract must be for a new state function *at the time the contract is executed.*

Our interpretation of subdivision (b)(2) is consistent with article VII. Such constitutional limitations on an agency's ability to contract out state work are necessary to protect "the policy of the organic civil service mandate against dissolution and destruction." (*California State Employees' Assn.* v. *Williams, supra,* 7 Cal.App.3d at p. 397.)

Moreover, the Legislature anticipated there might be questions whether work to be contracted out involves a new or existing state function, and provided a means of review on a case-by-case basis. "The State Personnel Board, at the request of an employee organization that represents state employees, shall review the adequacy of any proposed or executed contract which is of a type enumerated in subdivision (b) of Section 19130." (§ 19132.)

There may be cases in which contracts with private firms are executed close to the date the authorizing legislation becomes operative. In *Williams,* the Medi-Cal legislation became operative on March 1, 1966. The Medi-Cal agency began to contract with nongovernmental health service programs the month before. (*California State Employees' Assn.* v. *Williams, supra,* 7 Cal.App.3d at p. 393.) In other cases, personal service contracts may be executed on or after the effective date of an authorizing statute. And, a state agency may or may not have utilized state employees to carry out the legislatively authorized state program.

Nevertheless, where, as here, personal service contracts are executed 20 years after an authorizing statute is enacted and a designated state agency utilizes state employees for most of the work on the program authorized by that statute during those intervening years, the Board may properly decide the work eventually contracted out does not relate to or stem from a new state function within the meaning of the statute. Consequently, we conclude the trial court erred by construing and applying subdivision (b)(2) to reach the opposite result. As for any gray area between this case and *Williams,* or

between this case and one in which the agency never utilized state employees in a legislatively authorized program, we are confident the Board is competent to carry out its statutory mandate to review the adequacy of any proposed personal service contracts on a case-by-case basis.

## II

### *Welfare and Institutions Code Section 19403*

CALARF contends the Board's decision was invalid because the Caltrans contracts with developmentally disabled workers met the legislative goals embodied in Welfare and Institutions Code section 19403, which states:

"It is the intent of the Legislature to encourage state organizations, cities, counties, districts, and other political subdivisions to purchase products manufactured by and services provided by public or private nonprofit California corporations operating workshops serving the handicapped whenever it is *feasible* to do so and the proximity of the public or private nonprofit California corporations operating workshops serving the handicapped makes such purchases reasonably convenient and to provide equality of competitive advantage for organizations operating workshops for handicapped persons and organizations operating workshops for blind persons." (Italics added.)

We are unable to discern from the court's oral statement of decision whether the court based its ruling on CALARF's argument. In any event, we reject CALARF's contentions.

It is not "feasible" for a state agency to contract with private firms providing services of handicapped persons if the contracts violate article VII and subdivision (b)(2). The fact Welfare and Institutions Code section 19404 states agencies may use services provided by workshops serving the handicapped "without advertising or calling for bids," does not exempt the agency from compliance with other constitutional or statutory requirements.

CALARF argues the Caltrans contracts with private firms providing developmentally disabled workers are permitted under section 19130, subdivision (b)(5). However, Caltrans does not seek an exemption under that subdivision.

## DISPOSITION

The judgment is reversed. Each party shall bear its own costs.

Puglia, P. J., and Raye, J., concurred.

A petition for a rehearing was denied July 9, 1992, and respondents' petition for review by the Supreme Court was denied August 27, 1992. Panelli, J., was of the opinion that the petition should be granted.